**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 18bk33669 |
| | ) | Chapter 7 |
| Ronald L. Schumacker, | ) | |
| | ) | |
| Debtor. | ) | Judge LaShonda A. Hunt |
| | ) | |
| | ) | Adv. No. 19ap00125 |
| Imperial Roofing, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Ronald L. Schumacker, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION**

Defendant Ronald Schumacker subcontracted with plaintiff Imperial Roofing, Inc. on two

residential roofing projects.  Imperial Roofing completed the work and invoiced Schumacker for

the contract price.  Schumacker collected payment directly from at least one of the homeowners

but refused to pay Imperial Roofing anything, citing substandard workmanship.  Imperial Roofing

eventually sued Schumacker in state court and obtained a default judgment.  Collection efforts

ceased when Schumacker filed for bankruptcy. Imperial Roofing commenced this adversary

complaint seeking to except the debt from discharge for fraud or defalcation by a fiduciary,

embezzlement, or larceny under 11 U.S.C. § 523(a)(4).

The case proceeded to trial in November 2020.  During closing argument, Imperial Roofing

orally moved to amend the complaint to conform to the evidence by adding a non-dischargeability

claim based on willful and malicious injury under section 523(a)(6).  Upon consideration of the

admissible evidence and the arguments of the parties, the court concludes that Imperial Roofing

has not satisfied its burden of proof on a section 523(a)(4) claim or shown that Schumacker

consented to trial on a section 523(a)(6) claim. This decision constitutes the court's findings of

fact and conclusions of law under Fed. R. Civ. P. 52(a), made applicable by Fed. R. Bankr. P.

7052.

## BACKGROUND

The following facts are drawn from the trial testimony and pre-trial stipulations. The

relevant facts are mostly undisputed. The court also takes judicial notice of the dockets in the

bankruptcy case and the adversary proceeding. *See Inskeep v. Grosso (In re Fin. Partners)*, 116

B.R. 629, 635 (Bankr. N.D. Ill. 1989).

Schumacker sought chapter 7 bankruptcy relief in December 2018 and received a discharge

in March 2019. Prior to entry of the discharge order, Imperial Roofing timely filed this adversary

complaint challenging the dischargeability of its debt under section 523(a)(4). Appearing *pro se,*

Schumacker answered the complaint and denied any wrongdoing. At the request of the presiding

judge,[1] the clerk of court inquired if an attorney from the bankruptcy court volunteer panel would

be willing to provide pro bono representation to Schumacker, and Paul Camarena agreed.[2]

Following informal discovery, a half-day trial was held on Zoom. Four witnesses testified—

Schumacker, homeowner Patricia Wallace-Santiago, Imperial Roofing owner, Jorge Franchini,

and bookkeeper/office manager, Laura Tinoco.

In March 2017, Schumacker contacted Imperial Roofing about engaging its services.

Imperial Roofing had been in business since 1996, doing roofing, siding, soffit, fascia, and gutters.

---

[1] This case was assigned to Bankruptcy Judge Pamela S. Hollis until her retirement in January 2020.

[2] See https://www.ilnb.uscourts.gov/us-bankruptcy-court-volunteer-attorney-panel. The court expresses its sincere appreciation to Mr. Camarena for his service to the bankruptcy court and the public.

Schumacker told Franchini he was a contractor with a roofing business and a lot of insurance work. In September 2017, Schumacker and Franchini visited and inspected Wallace-Santiago's home in Chicago. Wallace-Santiago was using insurance proceeds to fund the repairs needed after storm damage. Franchini submitted a proposal to Schumacker, and they ultimately agreed upon a contract price of $9,074.

In late November 2017, Imperial Roofing finished the job at Wallace-Santiago's home and billed Schumacker the full contract price. Unbeknownst to Franchini, Wallace-Santiago had given Schumacker a deposit of $2,287.31 in September 2017. And then in December 2017, she tendered to Schumacker a check for the final payment of $6,861.95.[3]   However, Schumacker did not pay Imperial Roofing for the roofing work at the Chicago property.

Around the same time, Schumacker hired Imperial Roofing for another residential roofing project in Bedford Park. Imperial Roofing started the work in December 2017 and finished a few weeks later.  In January 2018, Franchini invoiced Schumacher for $3,570.  The record is unclear on whether Schumacker received payment for the Bedford Park job—either from the homeowners or their insurance company. But similar to the Chicago project, Schumacker did not pay Imperial Roofing.

Schumacker justified withholding funds from Imperial Roofing because of substandard workmanship. Franchini and Tinoco attested to multiple phone calls, text messages, and emails seeking a punch list of unfinished items, which Schumacker admits he never provided. Franchini also testified that Schumacker repeatedly claimed he was waiting for the homeowners to receive insurance money, in order to induce Imperial Roofing to refrain from filing a mechanic's lien.

---

[3] The two checks total $9,149.26. Neither party explained the additional $75.26 over and above the contract price. The difference is immaterial to the court's analysis.

The situation came to a head in March 2018 after Wallace-Santiago reached out directly to Imperial Roofing for an estimate on additional gutter work at her home.  While visiting the Chicago property, Franchini mentioned the outstanding bill for the 2017 roofing job.  Expressing surprise, Wallace-Santiago told Franchini about the payments to Schumacker months earlier.  Franchini immediately called Schumacker and handed his cell phone to Wallace-Santiago.  When she asked Schumacker why the roofers had not been paid, Schumacker hung up on her.  Wallace-Santiago explained that she had some leaking in her dining room windows in January/February 2018 due to ice wells forming on the gutters but said a roofing inspector sent by Schumacker did not identify the roof as the cause of the problems.  Wallace-Santiago further confirmed that she was fully satisfied with Imperial Roofing's work.  Concerning the Bedford Park job, Schumacker claimed Imperial Roofing's work was so bad that the homeowners, who were longtime personal friends, had threatened suit, and he ultimately settled the dispute by paying approximately $900 to finish the incomplete job.

In April 2018, Imperial Roofing filed a breach of contract suit against Schumacker in the Will County Circuit Court.  Schumacker did not appear in defense.  The state court found in favor of Imperial Roofing and entered a default judgment for $13,476.02 plus costs of the suit.  That is the debt Imperial Roofing asserts is non-dischargeable.

## **JURISDICTION**

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 151 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## DISCUSSION

### I.        Section 523(a)(4)

Individual debtors are normally granted a discharge of debts at the conclusion of their chapter 7 cases. *See* 11 U.S.C. § 727. However, the right to a discharge is not without limits. In particular, section 523 of the Bankruptcy Code lists several exceptions to dischargeability. At issue here is section 523(a)(4), which excepts from discharge a debt obtained through "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). Courts generally construe these exceptions narrowly and in favor of debtors. *Follett Higher Educ. Group, Inc. v. Berman (In re Berman)*, 629 F.3d 761, 767 (7th Cir. 2011).

To establish non-dischargeability under this subsection, creditors must prove by a preponderance of the evidence that at least one of the three listed scenarios has occurred. *Grogan v. Garner,* 498 U.S. 279, 291 (1991). Those are: (1) when a debtor acts in a fiduciary capacity and commits fraud or defalcation; (2) when a debt arises out of the debtor's embezzlement; or (3) when the debt arises from larceny committed by the debtor. *Joyce v. Wish (In re Wish)*, 472 B.R. 763, 782 (Bankr. N.D. Ill. 2012). Imperial Roofing relies on all three theories in this proceeding.

It is important to note that although the three prongs are grouped together in one subsection, they do not all require the same elements to be met for a debt to be deemed non-dischargeable. There is a threshold question—whether the debtor owed the creditor a fiduciary duty—that is invoked for debts obtained through fraud or defalcation but not those obtained through embezzlement or larceny. *See Green v. Pawlinski (In re Pawlinski)*, 170 B.R. 380, 390 (Bankr. N.D. Ill. 1994). Thus, if the court finds that no fiduciary duty existed between the parties, the inquiry into fraud or defalcation will end, but a claim of embezzlement or larceny would still be ripe for consideration.

It is undisputed that Schumacker was acting as a general contractor when he subcontracted with Imperial Roofing for services at residential properties in Chicago and Bedford Park.  The parties also agree that Imperial Roofing did in fact perform contract work for which Schumacker refused to pay.  Imperial Roofing contends that Schumacker's withholding of monies due amounts to fraud while acting in a fiduciary capacity, embezzlement, and a larceny of services.  But the evidence does not support those findings.

## A.  Fraud or Defalcation By a Fiduciary

To prevail on a claim of non-dischargeability due to fraud or defalcation while the debtor was acting in a fiduciary capacity, an objecting creditor must prove two distinct elements: "(1) the debtor acted as a fiduciary to the creditor at the time the debt was created; and (2) the debt was caused by fraud or defalcation." *Korrub v. Cohn (In re Cohn)*, 561 B.R. 476, 489 (Bankr. N.D. Ill. 2016) (citation omitted).  For starters, Imperial Roofing must demonstrate that Schumacker acted in a fiduciary capacity.  *Lexington Health Care Ctr. Of Elmhurst v. McDade (In re McDade)*, 282 B.R. 650, 657–58 (Bankr. N.D. Ill. 2002).  Either the existence of an express trust or an implied fiduciary relationship between the parties will suffice.  *Berman*, 629 F.3d at 768.

## 1.  Express Trust

Traditionally, an express trust was the only way a fiduciary duty could be established in bankruptcy. *Id.*  An express trust is created where there is an "explicit declaration of trust, a clearly defined trust res, and an intent to create a trust." *ColeMichael Invs., LLC v. Burke (In re Burke)*, 405 B.R. 626, 649 (Bankr. N.D. Ill. 2009).  In the instant case, neither party contends nor does the record reflect the existence of an express trust.  Imperial Roofing and Schumacker did not make a special agreement to create a trust.  The funds paid to Schumacker were not supposed to be

segregated into their own separate account.  And finally, Imperial Roofing did not allege in its complaint or assert at trial that it ever intended to create an express trust with Schumacker.

### 2. Implied Fiduciary Relationship

Imperial Roofing must therefore rely on an implied fiduciary relationship. *CR Adventures LLC v. Hughes (In re Hughes)*, 609 B.R. 789, 797 (Bankr. N.D. Ill. 2019).  A "fiduciary duty" under this test includes circumstances where, although there is not a literal "trust," the same high standard of a trust is necessary.  *O'Shea v. Frain (In re Frain)*, 230 F.3d 1014, 1017 (7th Cir. 2000).  While state law traditionally defines what constitutes a fiduciary duty, in bankruptcy "the existence of a fiduciary relationship is a matter of federal law." *Id.*  And that label applies to a limited subset of situations.

First, the obligations and duties of the parties must arise independently of the alleged wrong. *In re Marchiando,* 13 F.3d 1111, 1115 (7th Cir. 1994).  For example, "a lawyer's fiduciary duty to his client, or a director's duty to his corporation's shareholders, preexists any breach of that duty, while in the case of a constructive or resulting trust there is no fiduciary duty until a wrong is committed." *Id.* at 1115–16.  Here, that means Schumacker must owe a specific duty to Imperial Roofing that precedes and is distinct from the debt or obligation that Imperial Roofing maintains is non-dischargeable.    Second, the relationship must be one that involves "special confidences" that distinguish it from the ordinary principal-agent or buyer-seller relationship. *See Berman*, 629 F.3d at 771.  That can be shown where there is "a difference of knowledge or power between the fiduciary and principal which . . . gives the former a position of ascendancy over the latter." *Thazhathuputhenpurac v.  Abraham (In re Abraham)*, 582 B.R. 202, 216 (Bankr. N.D. Ill. 2018) (quotation omitted).

7

Normal commercial relationships, such as one between a contractor and subcontractor, do not tend to have the pre-existing duty or special confidences that are required for an implied fiduciary relationship under section 523(a)(4).  *Stair One, Inc. v. Hivon (In re Hivon)* involved a factually similar case with a debtor subcontractor (Hivon) who failed to remit payment to his sub-subcontractor (Stair One).  *Hivon,* Case No. 14 B 26441, Adv. No. 14 A 710, 2015 WL 687124 (Bankr. N.D. Ill. Feb. 13, 2015).  Hivon moved to dismiss the adversary complaint for failure to state a claim under section 523(a)(4).  The court rejected Stair One's argument that the Illinois Mechanics Lien Act provided a remedy in requiring Hivon to "hold in trust" funds due to subcontractors, reasoning that a contractor does not have duties "of a fiduciary character until a subcontractor is not paid." *Id.* at \*5. Furthermore, the court held that an implied fiduciary relationship did not exist because there was no evidence of "trust-like obligations" arising before the supposed wrong or that the relationship between the contractor/subcontractor was one of "special confidence." *Id.* at \*6-7.  Instead, this was a regular commercial relationship involving a construction contract and those business dealings, without something more, did not amount to or imply any sort of fiduciary duty. *Id.* at \*7.

The same logic applies here.  Schumacker and Imperial Roofing had a typical contractor and subcontractor relationship, a point even Franchini conceded at trial.  Schumacker, as general contractor, made a deal with the homeowners to oversee the work done on their property, and then made a separate deal with the subcontractors to complete the work.  Schumacker was a middleman, so to speak.  Imperial Roofing bid on subcontractor jobs for Schumacker.  Proposals were accepted and contractual obligations created between them such that after Imperial Roofing performed, Schumacker had a duty to remit payment.  As the Illinois Supreme Court so aptly stated, "[t]he customer of the subcontractor is the general contractor, not the homeowner." *MD Elec. Contrs.,*

8

*Inc. v. Abrams*, 228 Ill. 2d 281, 293 (2008).  In other words, the parties had a standard creditor-debtor relationship that involved a breach of contract.  *See Berman*, 629 F.3d at 771.  Nothing in the record reflects that Schumacker assumed trust-like responsibilities at any time, and certainly not before the breach.

Imperial Roofing nonetheless contends that Schumacker held a "position of ascendancy" due to his access to the homeowners and control of the collection of payments. "Situations in which one party to the relation is incapable of monitoring the other's performance of his undertaking" can demonstrate an inequality in position.  *Marchiando*, 13 F.3d at 1116.  However, this scenario is distinguishable.  As noted above, Schumacker separately hired Imperial Roofing and agreed to pay them for services provided, whether the homeowners paid or not.  That Schumacker had the ability to more easily interface with the expected payment source does not mean he possessed an unfair advantage in knowledge or power that, in turn, created a fiduciary duty.

Indeed, Imperial Roofing does not identify anything Schumacker did to prevent it from asking the homeowners directly about the status of payments for completed work. Franchini learned from Wallace-Santiago that Schumacker had already been paid when she contacted Imperial Roofing to obtain a bid for other work at her home.  As such, Imperial Roofing has not shown that Schumacker was in a position to stop it from accessing payment information or filing a mechanic's lien on the properties to protect its rights.

The agreement between Schumacker and Imperial Roofing was a commercial contract.  By not paying pursuant to the terms of their deal, Schumacker breached the contract.  But that breach, without more, does not create the fiduciary obligation that Imperial Roofing seeks to impose here. *Cf. Hivon,* 2015 WL 687124 at *7 ("A commercial relationship. . .even one that involves a party

holding money for another, does not imply any sort of fiduciary relationship.").   Without a

fiduciary duty, the court need not consider whether Schumacker committed fraud or defalcation.[4]

## B. Embezzlement

As previously discussed, the finding that Schumacker did not owe Imperial Roofing a

fiduciary duty is not fatal to the continuing analysis under section 523(a)(4).   A debt that was

obtained through embezzlement can also be exempted from discharge.   In the bankruptcy context,

embezzlement has been defined as: "the fraudulent appropriation of property by a person to whom

such property has been entrusted or into whose hands it has lawfully come." *In re Weber,* 892 F.26

534, 538 (7th Cir. 1989) (quoting *Moore v. United States*, 160 U.S. 268, 269 (1895)).   To prove

embezzlement, an objecting party must show that "(1) the debtor appropriated the creditor's

property for his or her own benefit and (2) the debtor acted with fraudulent intent or deceit."

*Groom v. Krook (In re Krook)*, 615 B.R. 479, 485 (Bankr. N.D. Ill. 2020).   However, "one cannot

embezzle property that he lawfully owns."  *Id.* at 486 (citation omitted).

Imperial Roofing argues that the funds Schumacker received from the homeowners were

Imperial Roofing's property because the homeowners intended the payments to be used to

compensate them for the roof repairs.   But that argument misses the mark.   The homeowners dealt

with and paid Schumacker directly pursuant to the terms of their contracts with him.   Although

Wallace-Santiago explained that she expected Schumacker to take his cut and then compensate the

---

[4] For the record, the court finds that Schumacker was not a convincing witness.  He changed his story multiple times, conveniently claiming an inability to remember clearly due to a stroke.  Schumacker allegedly paid thousands of dollars to a questionable consultant who supposedly inspected both the Chicago and Bedford Park jobs and confirmed that certain work had not been done by Imperial Roofing.  But Schumacker conceded he neither responded to Franchini's repeated inquiries for meetings to discuss the issues nor refunded any monies to Wallace-Santiago. Schumacker also acknowledged that Franchini asked for pictures of problem areas on both projects which Schumacker never sent. And Schumacker represented in sworn statements to the mortgage company that no subcontractors were working for him, even after he had hired Imperial Roofing. The court credits Franchini's testimony that Schumacker lied to him about not having received payment on at least the Chicago job and Wallace-Santiago's testimony that Schumacker hung up the phone when she tried to question him about paying the roofers.  The evidence in the record strongly supports a finding that Schumacker acted with an improper motive.

10

subcontractors, that does not alter the fact that the monies paid belonged solely to Schumacker as general contractor. It was up to Schumacker to distribute funds according to his own agreements with subcontractors. A dissatisfied subcontractor could file a mechanic's lien on the property to dispute the payment, thereby initiating a legal action to bring the homeowners into the fray. Otherwise, the homeowners owed Schumacker, and Schumacker owed Imperial Roofing. Because funds paid to Schumacker contractually belonged to Schumacker, he could not have committed embezzlement.

### C. Larceny

For a court to find a debt non-dischargeable due to larceny there must be a finding that a debtor "wrongfully took property from its rightful owner with fraudulent intent to convert such property to his own use without the owner's consent." *Busey Bank v. Cosman (In re Cosman)*, 616 B.R. 358, 371 (Bankr. N.D. Ill. 2020). Further, a finding of larceny requires that "a felonious intent exist at the time of the taking." *Rae v. Scarpello (In re Scarpello)*, 272 B.R. 691, 703 (Bankr. N.D. Ill. 2002). Imperial Roofing did not directly assert larceny in its pre-trial brief, but during closing argument, counsel stated that Schumacker's failure to remit payment to Imperial Roofing amounted to a larceny of its services. *See* Tr. at 140, ll. 1–4.

The larceny theory fails for the same reason as the embezzlement theory—the funds Schumacker received were not Imperial Roofing's property. Rather, Schumacker was the "rightful owner." And, courts have been hesitant to hold that intangible property, such as services, can be embezzled or subject to larceny. *See e.g., Hellenic Enter. I v. Vitogiannis (In re Vitogiannis)*, Case No. 08 B 4144, Adv. No. 08 A 315, 2009 WL 1372065 at *9-13 (Bankr. N.D. Ill. May 15, 2009) (reviewing cases).

11

## II.      Motion to Amend Complaint to Include Section 523(a)(6) Claim

During closing argument, counsel for Imperial Roofing orally moved the court to conform the pleadings to the evidence and also rule on whether Imperial Roofing's debt should be excepted from discharge under section 523(a)(6).  Imperial Roofing argued that the evidence at trial also demonstrated a willful and malicious injury. *See* Tr. at 141, ll. 12–18.   Schumacker objected to the addition of a new theory of liability at this late stage of the case and without prior notice.

Motions to conform pleadings to evidence presented at trial are "addressed by Bankruptcy Rule 7015, which incorporates Rule 15 of the Federal Rules of Civil Procedure." *Pummill v. Greensfelder, Hemker, & Gale P.C. (In re Richards & Conover Steel, Co.)*, 267 B.R. 602, 609 (B.A.P. 8th Cir. 2001).   Where the request to amend is brought during or after trial, and is not based on an objection at trial, then the applicable provision is subsection (b)(2) of Rule 15, which provides that:

> [w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue.

Fed. R. Civ. P. 15(b)(2).   Schumacker certainly did not express consent to trying this issue. Therefore, the question is whether a section 523(a)(6) claim was tried by implied consent. The decision to permit or deny an amendment falls "within the sound discretion of the bankruptcy court." *Johnson v. Woldman*, 158 B.R. 992, 997 (N.D. Ill. 1993).

The standard set forth by the Seventh Circuit to determine if consent has been established is "whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence had he known sooner the substance of the amendment." *Reynolds v. Tangherlini*, 737 F.3d 1093, 1106 (7th Cir. 2013) (citation omitted).  However, "a court will not imply consent to try a claim merely because evidence relevant to a properly pleaded issue

12

incidentally tends to establish an unpleaded claim." *Ippolito v. WNS, Inc.*, 864 F.2d 440, 456 (7th Cir. 1988).

For example, in *Insure One Independent Ins. Agency v. Koestner*, the plaintiff-debtor brought a three-count complaint against his former employer alleging, among other things, that he was terminated for asserting his rights under the bankruptcy code in violation of 11 U.S.C. § 525(b). 198 B.R. 708, 711 (N.D. Ill. 1996). The bankruptcy court found for the plaintiff on the section 525(b) claim and also held that he could recover damages for "retaliatory discharge under Illinois Law." *Id.* Although that issue was not raised in either the complaint or the answer, the bankruptcy court concluded the defendant had impliedly consented to trial on the retaliatory discharge claim. *Id.*

On appeal, the district court reversed the bankruptcy court. *Id.* at 714. The parties agreed that certain evidence proved both the federal retaliatory discharge and the state common law retaliatory discharge claims. *Id.* But the mere existence of some overlap of evidence related to a pleaded claim that incidentally proves an unpleaded claim was held insufficient to establish implied consent. *Id.*

Here, counsel did utilize the phrase "willful and malicious" twice before moving during closing argument to amend the complaint—in his pre-trial brief and during the opening statement. Specifically, Imperial Roofing accused Schumacker of "willfully and maliciously intend(ing) to 'borrow' these monies actually due the Plaintiff with perhaps no intent of inflicting injury." *See* Imperial Roofing Pre-Trial Brief, Dkt. 34. And then at trial, counsel asserted that, "523(a)(4) . . . also indicates that there can be a willful and malicious conversion, at least it indicates that in historical notes . . ." *See* Tr. pp. 10–11.

But after carefully reviewing the record and trial transcript, it appears that Imperial Roofing invoked that specific language to support its larceny and embezzlement claims, by repeating the words in the old bankruptcy statute that are included in the legislative history of section 523(a)(4). *See* H.R. REP. NO. 95-595, at 364 (1978), *reprinted in* BANKRUPTCY REFORM ACT OF 1978: A LEGISLATIVE HISTORY 364 (Alan N. Resnick & Eugene M. Wypyski eds. Vol. 13 1979) ("Paragraph 4 excepts debts for embezzlement and larceny . . . The intent is to include in the category of non-dischargeable debts a conversion under which the debtor willfully and maliciously intends to borrow property for a short period of time with no intent to inflict injury but on which injury is in fact inflicted.").  At best, the "willful and malicious" language refers to already-raised claims under section 523(a)(4), not potential new ones under section 523(a)(6).

Willfulness under section 523(a)(6) requires "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *First Weber Grp., Inc. v. Horsfall,* 738 F.3d 767, 774 (7th Cir. 2013). *Id.*  (citation omitted).  And maliciousness refers to acts done "in conscious disregard of [his] duties or without just cause or excuse." *Id.* (citation omitted). Schumacker's conduct arguably fits within both of those buckets.  Even though the evidence could support a finding under section 523(a)(6), it was too late to raise the theory for the first time at the end of the trial.  Schumacker was entitled to specific notice and an opportunity to defend himself, particularly against an unpleaded claim that sought to prevent a debt from being discharged in his bankruptcy case.  Because the court finds that Schumacker did not impliedly consent to the trial of a section 523(a)(6) claim, Imperial Roofing's oral motion to amend must be denied.

14

**CONCLUSION**

For all the foregoing reasons, judgment will be entered in favor of defendant/debtor

Richard Schumacker and against plaintiff Imperial Roofing, Inc.  Additionally, Imperial Roofing's

oral motion to amend its pleadings to include a count under 11 U.S.C. § 523(a)(6) will be denied.

A separate judgment will be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.


Dated:  July 15, 2021                                             ENTER:


_LaShonda A. Hunt_
_____
Honorable LaShonda A. Hunt
United States Bankruptcy Judge

15